1  ALLEN RUBY (SBN 47109)
   allen.ruby@skadden.com
2  THOMAS CHRISTOPHER (SBN 185928)
   thomas.christopher@skadden.com
3  JOSHUA M. TEMPLET (SBN 267098)
   joshua.templet@skadden.com
4  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   525 University Avenue
5  Palo Alto, California 94301
   Telephone: (650) 470-4500
6  Facsimile:  (650) 470-4570

7  ATTORNEY FOR PLAINTIFFS:
   GARDEN CITY, INC., dba CASINO M8trix,
8  AIRPORT PARKWAY TWO, LLC.,
   AIRPORT OPPORTUNITY FUND, LLC

Filed *Paid* NP
FEB 0 8 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

ADR

E-FILING

10            UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                 SAN JOSE DIVISION

13

CV 13-  0577  PSG

14  GARDEN CITY, INC., dba CASINO M8trix,     )  CASE NO.:
    a California corporation, AIRPORT         )
15  PARKWAY TWO, LLC., a California limited    )  COMPLAINT FOR DAMAGES,
    liability company, and AIRPORT            )  DECLARATORY RELIEF, AND
16  OPPORTUNITY FUND, LLC., a Delaware         )  INJUNCTIVE RELIEF
    limited liability company,                )
17                                            )  DEMAND FOR JURY TRIAL
                  Plaintiffs,                 )
18                                            )
          v.                                  )
19                                            )
    CITY OF SAN JOSE, a California municipal   )
20  corporation, SAN JOSE POLICE              )
    DEPARTMENT, for the City of San Jose,     )
21  RICHARD TENG, individually and as         )
    Administrator of the San Jose Police      )
22  Department Division of Gaming Control, and )
    DOES 1-100, inclusive,                    )
23                                            )
                  Defendants.                 )
24  _____  )

25

26

27

28

                              1
     COMPLAINT FOR DAMAGES, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

1  Plaintiffs Garden City, Inc., dba Casino M8trix, a California corporation, Airport Parkway
2  Two, LLC., a California limited liability company, and Airport Opportunity Fund, LLC., a
3  Delaware limited liability company, allege against Defendants the City of San Jose, a public entity,
4  the San Jose Police Department, a public entity, Richard Teng, an individual, and DOES 1-100,
5  inclusive, and each of them, as follows:

6  **NATURE OF THE ACTION**

7  1.  This is an action by Plaintiffs seeking redress against the City of San Jose and
8  various public officials for a long history of unreasonable, harassing, and malicious conduct that
9  has deleteriously interfered with Plaintiffs' ability to conduct business in the city and that has
10 deprived Plaintiffs of certain rights guaranteed to them by the United States Constitution. The
11 defendants are the City of San Jose, a public entity, the San Jose Police Department, a public entity,
12 and Mr. Richard Teng, who at all relevant times served as the Administrator of the City's Division
13 of Gaming Control. As detailed below, Administrator Teng has used his position of power and
14 authority to carry out a campaign of harassment against Plaintiffs by, among other things,
15 frustrating and unreasonably delaying the opening of their new Casino M8trix facility and by
16 placing unreasonable, burdensome, and unnecessary restrictions on the operation of Plaintiffs'
17 gaming business, all of which have caused substantial economic harm to Plaintiffs. Further,
18 Administrator Teng has carried out his unlawful activities while maintaining sustained and
19 substantial conflicts of interest through his lucrative private consulting business, the details of
20 which he has hidden from public scrutiny, in violation of the City of San Jose's Code of Ethics and
21 the public trust. Plaintiffs seek compensatory and punitive damages, a declaration that Defendants'
22 actions have violated Plaintiffs' constitutional rights to Due Process and Equal Protection, and
23 injunctions enjoining Defendants from further harming Plaintiffs.

24 **THE PARTIES**

25 2.  Plaintiff Garden City Inc., dba Casino M8trix ("GARDEN CITY" or "CASINO
26 M8TRIX") is a California corporation that operates the Casino M8trix cardroom, located at 1887
27 Matrix Boulevard (formerly 50 Airport Parkway) in San Jose, California. At all relevant times
28 GARDEN CITY was qualified to do business in California.

3.      Eric Gordon Swallow ("SWALLOW") is the Secretary and a shareholder of GARDEN CITY.

4.      Peter Victor Lunardi, III ("MR. LUNARDI") and Jeanine Lynn Lunardi ("MS. LUNARDI") (collectively the "LUNARDIS") are the two Trustees of the Lunardi Family Trust ("LUNARDI TRUST"). Peter Lunardi is President of GARDEN CITY, and Jeanine Lunardi serves as a board member. The LUNARDIS, through the LUNARDI TRUST, are shareholders of GARDEN CITY. (SWALLOW and the LUNARDIS are collectively referred to as the "OWNERS" in this Complaint.)

5.      Plaintiff Airport Opportunity Fund, LLC. ("AIRPORT FUND") is a Limited Liability Company organized and existing under the laws of the State of Delaware and authorized to do business in California. It is the sole owner of Airport Parkway Two LLC, the business entity used by SWALLOW and the LUNARDIS to purchase the property where CASINO M8TRIX is located. AIRPORT FUND is owned and controlled by SWALLOW and the LUNARDI TRUST.

6.      Defendant the City of San Jose (the "CITY") is located in the County of Santa Clara, State of California, and is a municipal corporation organized and existing under the laws of the State of California.

7.      Defendant the San Jose Police Department houses the Division of Gaming Control (the "DIVISION"), the administrative decision-making body of the CITY for the matters at issue herein. (References in this Complaint to the "DIVISION" refer to both Defendant the San Jose Police Department and its subsidiary administrative body, the Division of Gaming Control.) The DIVISION was created pursuant to Section 16.06.010 of Title 16 of the San Jose Municipal Code as part of the San Jose Police Department. The DIVISION is headed by an Administrator and employs a staff that includes San Jose police officers who serve as DIVISION investigators. The DIVISION is responsible for enforcing the gaming control regulations of Title 16 of the San Jose Municipal Code ("Title 16"), for example by conducting background investigations of cardroom employees, performing audits to assure cardroom regulatory compliance, investigating violations of Title 16, and hearing and making recommendations to the Chief of Police on regulatory actions

**COMPLAINT FOR DAMAGES, DECLARATORY RELIEF AND INJUNCTIVE RELIEF**

1  regarding cardroom permittees and licensees.

2      8.      Defendant Richard Teng ("TENG") is and was at all relevant times herein the

3  Administrator of the DIVISION, and is charged by law with the administration of Title 16 of the

4  San Jose Municipal Code to regulate gaming and cardrooms in San Jose.  The Administrator is

5  appointed by the City Manager and reports directly to the Chief of Police.  As the Administrator,

6  TENG is responsible for executing and administering the City of San Jose's laws, customs,

7  practices, and polices at issue in this lawsuit.  TENG has enforced and continues to enforce the

8  challenged laws, customs, practices, and policies against Plaintiffs.  TENG is sued in both his

9  individual and official capacities.

10     9.      Christopher M. Moore ("MOORE") was, until his retirement in January 2013, the

11  Chief of Police of the San Jose Police Department.

12     10.     Plaintiffs are unaware of the true names or capacities of Defendants Does 1 through

13  100, inclusive, and therefore sue these defendants, and each of them, by fictitious names.  Plaintiffs

14  will seek leave of Court to amend this Complaint to allege the true names and capacities of

15  Defendants Does 1 through 100 when those names and capacities have been ascertained.  Plaintiffs

16  are informed and believe and thereon allege that each of these fictitiously named defendants is

17  responsible and liable in some manner for the claims, demands, losses, acts and damages alleged

18  herein.  Each reference in this complaint to "defendant," "defendants," or a specifically named

19  defendant refers also to all defendants sued under fictitious names.

20     11.     At all times mentioned, each Defendant was the agent and employee of each

21  remaining Defendant and, in doing the things hereinafter alleged, was acting within the course and

22  scope of such agency.

23     12.     All acts and omissions complained of herein were done, or not done, as the case

24  may be, while the Defendants were acting under color of state law or local ordinance.

25                          **JURISDICTION AND VENUE**

26     13.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

27  § 1331, as this action concerns the deprivation of rights secured by the United States Constitution.

28     14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a

4

**COMPLAINT FOR DAMAGES, DECLARATORY RELIEF AND INJUNCTIVE RELIEF**

1  substantial part of the events or omissions giving rise to the claims raised in this lawsuit occurred

2  in this judicial district, or, alternatively, a substantial part of property that is the subject of this

3  action is situated in this district.

4      15.    Assignment to the San Jose Division of this District is proper pursuant to Local Rule

5  3-2(c), because a substantial part of the events or omissions giving rise to the claims raised in this

6  lawsuit occurred in Santa Clara County.

7                              **FACTUAL BACKGROUND**

8            **Swallow and the Lunardis Purchase and Revitalize Garden City**

9      16.    Garden City, Inc., a San Jose permitted cardroom, has been in business since 1976.

10  Under its prior ownership, the Garden City cardroom suffered severe financial difficulties

11  culminating in it seeking protection under Chapter 11 of the Federal Bankruptcy Code in 1998.

12      17.    SWALLOW, a businessman and innovator by trade, and the LUNARDIS,

13  experienced real estate investors, saw in the bankrupt Garden City cardroom an interesting and

14  challenging professional opportunity.  Accordingly, in March 2007, SWALLOW and the

15  LUNARDIS purchased and became the owners of GARDEN CITY, rescuing it from bankruptcy.

16  Thereafter, they began working tirelessly to turn the failed enterprise into a successful and

17  profitable endeavor.  Since March 2007, the OWNERS have worked hard to revamp and revitalize

18  GARDEN CITY, improving and streamlining its business operation, training its workforce, and

19  expanding its customer base.  The hard work and dedication of the OWNERS and their employees

20  paid off, and under their watchful stewardship GARDEN CITY reemerged from bankruptcy, repaid

21  its creditors, expanded its business, and thrived.

22      18.    Among the many beneficiaries of CASINO M8TRIX's success, in addition to its

23  OWNERS, employees, vendors and independent contractors, is the City of San Jose.  CASINO

24  M8TRIX's tax contribution of fifteen percent of its daily earnings, in addition to the significant

25  amount it pays in annual table fees, has amounted to many millions of dollars in increased tax

26  receipts for San Jose.  As San Jose Mayor Chuck Reed recognized, Casino M8trix "will generate

27  more tax revenues for the city of San Jose than [Westfield] Valley Fair [mall] and Santana Row

28  combined." ("SJ's Casino M8trix holds lucky ribbon-cutting," Aug. 8, 2012, KGO-TV/DT,

1  available at "http://abclocal.go.com".)  In addition, CASINO M8TRIX has provided hundreds of

2  jobs with good wages and benefits to San Jose's residents and makes a number of charitable

3  donations.

4      19.      Moreover, CASINO M8TRIX offers a safe and secure venue for legalized,

5  regulated gaming within the city, thereby reducing the occurrence of illegal and unregulated

6  gambling and associated criminal activity.

7      20.      As detailed below, CASINO M8TRIX's success has come in spite of the numerous

8  unlawful, harassing, and malicious actions taken by Defendants in an effort to derail the operation

9  of Plaintiffs' business for no legitimate purpose.

10          **The Division Targets Casino M8trix and Its Key Employees for**
11          **Unending Harassment and Delays**

12     21.      Upon taking over GARDEN CITY in 2007, the OWNERS had an immediate need

13  to staff its key positions, including positions overseeing the cardroom's security, surveillance, and

14  compliance.  But the OWNERS were stymied in their efforts to meet their urgent employment

15  needs by Defendants' unreasonable delay in processing GARDEN CITY personnel's gaming

16  licenses, in some cases taking months or even years to process license applications that are a

17  prerequisite to employment in the gaming industry in San Jose.  By delaying the issuance of these

18  licenses, Defendants hampered GARDEN CITY's ability to hire employees and independent

19  contractors necessary to operate its business.

20     22.      For example, since 2002 TENG had allowed GARDEN CITY to employ a single

21  Director of Security, Surveillance, and Compliance.  When the OWNERS assumed ownership and

22  operation of GARDEN CITY and submitted a licensing application for a new director, Harold

23  Furtado ("Furtado"), TENG suddenly forbid OWNERS from allowing Furtado to serve in such a

24  combined capacity.  Instead, TENG permitted Furtado to serve as Director of Security only.

25     23.      The DIVISION then took *ten months* to process Furtado's key employee license.  In

26  a letter sent to Furtado in September 2007, TENG informed Furtado that he estimated that the

27  DIVISION's background investigation of him "may be completed by March 31, 2008" and

28  instructed Furtado: "you shall not begin work at Garden City cardroom while your background is

1  being investigated." Under Title 16, Furtado could not work at the cardroom until the DIVISION

2  approved his license, unless the DIVISION granted him a temporary license to work in the interim.

3  TENG refused to grant Furtado such a temporary license, preventing Furtado from starting work

4  for nearly a year, and leaving GARDEN CITY without a Director of Security in the meantime.

5  This resulted in harm to GARDEN CITY from, for example, GARDEN CITY's inability to make

6  significant hiring, staffing, and promotional decisions regarding security staff during this period, or

7  to engage in the necessary training of GARDEN CITY's security personnel.

8        24.      Following the ten-month delay in processing Furtado's key employee license,

9  TENG granted Furtado only a temporary license. To date, despite numerous requests, TENG has

10  never granted him a full license.

11       25.      Similarly, GARDEN CITY employee Michael G. Scott applied for his key

12  employee license to serve as Director of Surveillance for GARDEN CITY in or about May 2007.

13  His application was not approved until fourteen months later, when he likewise received only a

14  temporary license.

15       26.      In fact, the DIVISION has ensured that *none* of GARDEN CITY's key personnel

16  has a full key employee license. GARDEN CITY'S Cage Manager Maria Hagen, for example,

17  submitted her key employee license application in June 2001, and to date, *over a decade later*,

18  despite dutiful responses to the DIVISION's paperwork requests and attendance at its scheduled

19  interviews, the DIVISION has yet to issue her a full key employee license.

20       27.      Plaintiffs rely on their key personnel to operate their Casino M8trix cardroom. By

21  orchestrating the systematic temporary licensing of CASINO M8TRIX's key personnel,

22  Defendants have given themselves the unchecked ability to revoke the lawful status of the entirety

23  of CASINO M8TRIX's key workforce at a moment's notice. Such vulnerability to the caprice of

24  Defendants cripples the reliability of Plaintiffs' workforce and unreasonably interferes with

25  Plaintiffs' ability to operate their business.

26  **Defendants Have Unlawfully Delayed and Interfered with Plaintiffs' Relocation Efforts**

27       28.      As unreasonable as Defendants' conduct had been with respect to the granting of

28  necessary licenses to GARDEN CITY employees in the years since the OWNERS took over,

1   Defendants' campaign of harassment reached a crescendo in 2011 through 2012, when Defendants

2   harmed Plaintiffs by unlawfully hampering and delaying CASINO M8TRIX's relocation of its

3   business.

4       29.     In or about 2010, the OWNERS decided to relocate their business to a larger, more

5   modern facility. Accordingly, in 2010, Plaintiffs notified the CITY of their intent to build a new

6   Casino M8trix cardroom. The San Jose City Council approved construction and zoning for the

7   project in May 2010 and the CITY granted a Planned Development Permit (PDP10-025) on

8   December 17, 2010, authorizing Plaintiffs' new cardroom at 1887 Matrix Boulevard in San Jose,

9   California.

10       30.     After obtaining this approval, the OWNERS secured the necessary financing to

11   purchase the property on which to construct their anticipated $50 million high-rise cardroom that

12   would become the new face of CASINO M8TRIX. The chosen location was in a high traffic area,

13   on Airport Parkway, neighboring both the Mineta San Jose International Airport and U.S. Interstate

14   101. The OWNERS purchased the property through AIRPORT PARKWAY. Effective January 1,

15   2011, CASINO M8TRIX entered into a ten-year lease of the property and began development of

16   Casino M8trix.

17       31.     Since the San Jose City Council's approval of the Casino M8trix development

18   project at the end of 2010, Plaintiffs regularly met with DIVISION employees, including TENG.

19   Plaintiffs and Defendants reached an understanding that the target opening date of CASINO

20   M8TRIX was April 2012. Accordingly, since 2011 Plaintiffs have planned on opening CASINO

21   M8TRIX in April 2012.

22       32.     Since 2011, Defendants have unlawfully interfered with, delayed, and restricted

23   CASINO M8TRIX's move into its new cardroom for no valid purpose and at great harm and

24   expense to Plaintiffs.

25       33.     As an initial matter, Defendants acted unlawfully with respect to their handling of

26   Plaintiffs' application for an landowner license, which they required Plaintiffs and the OWNERS to

27   obtain for the new cardroom location. In order to ensure the timely processing of gaming-related

28   licenses, Section 16.32.110(C) of Title 16 provides that "[t]o the extent practicable, the

8

**COMPLAINT FOR DAMAGES, DECLARATORY RELIEF AND INJUNCTIVE RELIEF**

1  administrator of [the DIVISION] shall act on all [license] applications **within one hundred and**
2  **eighty calendar days of the date of receipt of a completed application . . . .**" (Emphasis added.)
3  Here, the Division unlawfully delayed issuing its recommendation on OWNERS' landowner
4  license until July 13, 2012, *over a year after* Plaintiffs had submitted their application on March 31,
5  2011.

6      34.      Further, Defendants' investigation-related delays were unnecessary given that (i)
7  Defendants had already conducted extensive background investigations of each of the OWNERS
8  before issuing them stock ownership licenses in 2007, as detailed below; and (ii) the California
9  Gambling Control Commission had also already investigated OWNERS, as a prerequisite for
10  issuing to them an Owner's Gambling License in 2007.

11     35.      Defendants conducted their landowner license investigation from approximately
12  April 2011 to July 2012. The investigation was outsourced to a consulting firm that, under the
13  supervision of TENG, conducted a protracted investigation that including numerous and piecemeal
14  document requests to each of the OWNERS, as well as meetings and phone interviews, much of
15  which covered material already addressed in previous licensing investigations.

16     36.      Among the redundant and unnecessary work repeated during the course of this
17  roving investigation was the reinvestigation for re-approval of the same bank that the DIVISION
18  and TENG had vetted for OWNERS' financing of their initial purchase of GARDEN CITY only a
19  few years earlier. In 2007, the OWNERS had received funding from Comerica Bank to finance
20  their purchase of GARDEN CITY. They now planned to use the same bank to finance their
21  purchase and development of Casino M8trix. Whatever doubts the DIVISION and TENG may
22  have had as to the propriety of OWNERS' choice of seeking financing from Comerica Bank—a
23  160-year-old institution that is among the 25 largest banking companies in the nation—such doubts
24  should have been put to rest when the DIVISION approved Comerica as a funding source in 2007.
25  Instead, TENG insisted that the investigation cover the same tracks once again, imposing extra cost
26  and delay on Plaintiffs.

27     37.      Furthermore, Defendants failed to comply with the requirement of section
28  16.32.100(B) of title 16 that the Administrator set forth a schedule of investigation costs and

9

1 | charges to be used as guidelines in fixing the amount of any deposit required by the DIVISION.
2 | Instead, Defendants simply demanded that OWNERS and AIRPORT FUND pay a $60,000
3 | landowner license fee deposit, with no basis upon or reference to this figure in any such schedule.
4 | In an August 10, 2011 letter to TENG, GARDEN CITY's counsel informed TENG of this violation
5 | of title 16 and requested, ". . . a copy of the Division of Gaming's Guideline Schedule of Costs and
6 | Charges relating to background investigation deposit fees as reflected in the City Manager's Fee
7 | Schedule . . . ." TENG never provided this requisite information to GARDEN CITY. The
8 | DIVISION thereafter further demanded, as a condition of granting the landowner license, that
9 | Plaintiffs pay **$180,000** in fees, which the DIVISION's consultant had amassed from conducting
10 | the unnecessary and repetitive background investigation.

11 |       38.     Perhaps contributing to the excessive length and cost of the background
12 | investigation was the lack of accounting experience and expertise of the consulting firm retained by
13 | Defendants to conduct the investigation.  Rather than using one of the several certified public
14 | accountant firms on retainer with the CITY, Defendants instead awarded the investigation contract
15 | to an outside private investigation firm, Conroy and Associates, Inc., headed by a former San Jose
16 | Police Department colleague of MOORE's.  Upon information and belief, Conroy and Associates
17 | employed no certified public accountants.  Lacking the financial investigation training and tools of
18 | an accounting firm, such as the ability to conduct an attestation engagement, Defendants' chosen
19 | contractor engaged in needless and wasteful practices during the course of its investigation.  For
20 | example, it conducted a painstaking hand comparison of hundreds of documents, when the
21 | preferred and more efficient method for such analysis would have been to review a random sample
22 | of records, from which broad results could have been extrapolated.

23 |       39.     In contrast, when Defendants conducted a financial background investigation of Bay
24 | 101, CASINO M8TRIX's direct and only competitor, regarding its management's 2007 stock
25 | transfer, Defendants retained an appropriately qualified, professional accounting firm, staffed by
26 | certified public accountants who engaged in an efficient and industry-standard sampling analysis of
27 | the finances at issue in that investigation.

28 |       40.     Defendants also acted unlawfully with respect to their handling of CASINO

1 | M8TRIX's application for an amendment to its cardroom permit to reflect the relocation of its

2 | cardroom.  CASINO M8TRIX submitted its cardroom permit amendment application on March 30,

3 | 2011.  Under section 16.30.200(E) of title 16, "[w]ithin a **reasonable time period** after receipt of a

4 | completed application, the administrator shall file a public report . . . ," (emphasis added),

5 | including, *inter alia*, (i) a recommendation to the chief of police as to whether the requested

6 | amendment should be granted; and (ii) the reasons for the recommendation.  For reasons that were

7 | never explained to Plaintiffs, TENG delayed completion of a Permit Amendment Report for nearly

8 | *16 months,* until July 20, 2012.  Although the report ultimately recommended approving certain of

9 | CASINO M8TRIX's requested permit amendments, such amendments were severely crippled by

10 | the imposition of unlawful conditions, and one amendment was unlawfully further "deferred" for

11 | four months.

12 |     41.    Among the crippling limitations that Defendants imposed on CASINO M8TRIX's

13 | cardroom permit amendment application was a restriction threatening to prohibit CASINO

14 | M8TRIX from employing independent contractors that it relies on to operate its business.  The

15 | condition reserves TENG's purported authority to "call forward" for licensing and to make subject

16 | to his "express waiver" various independent contractors who help to operate CASINO M8TRIX.

17 | These contractors include CASINO M8TRIX's security contractor, Imperium Security Specialists,

18 | LLC, its food and beverage contractor, NYC Food & Beverage, Inc., and "any other independent

19 | contractors, currently, or in the future, retained and/or employed by Casino M8trix . . . ."  However,

20 | title 16 imposes no such requirement that a cardroom's independent contractors obtain an "express

21 | waiver" of their independent contractor status in order to remain employed as independent

22 | contractors.  In contrast, title 16 imposes a mandatory duty on TENG to allow qualified

23 | independent contractors to work for cardroom permittees in gaming operation positions, unless

24 | TENG makes an affirmative finding that ". . . granting such an exception would be inconsistent

25 | with the efficient administration of the division, the public interest, and the policies and

26 | requirements of this Title.  San Jose Mun. Code, tit. 16, § 16.20.020(B) (". . . **the administrator**

27 | **shall allow** a natural person who is otherwise qualified who wishes to work for the cardroom

28 | permittee as an independent contractor in a position related to the gaming operation to apply for

11

1  and hold such a position as an independent contractor rather than as an employee . . . .") (emphasis
2  added).

3      42.     Facing the daily loss of tens of thousands of dollars in operating expenses and lost
4  revenue as their $50-million dollar cardroom sat vacant, Plaintiffs had no choice—as Defendants
5  well understood—but to purport to accept Defendants' unreasonable and unlawful conditions in
6  order to open CASINO M8TRIX at its new location and resume business operations.

7      43.     As a result of Defendants' unlawful delay of the landowner licensing and cardroom
8  permit amendment processes, and due to yet further delays by Defendants, CASINO M8TRIX was
9  not permitted to open for business until August 7, 2012, four months after its planned opening in
10  April 2012.

11      **Defendants Unlawfully Delayed and Denied Plaintiffs' Use of Casino M8trix's**
12      **Eighth Floor for Gaming**

13      44.     Through several CITY-issued permits and discussions and documentation in support
14  of the same, GARDEN CITY and the CITY reached an understanding that the eighth floor of the
15  new CASINO M8TRIX cardroom building would be used for gaming.  In 2010, GARDEN CITY
16  submitted to the CITY detailed blueprints of its new cardroom building, in support of its PDA10-
17  025 Planned Development Permit application.  Later, GARDEN CITY submitted additional
18  blueprints in support of an amendment (PDA10-025-01) to its permit application. The blueprints
19  illustrated the use of the eighth floor for gaming and included depictions of gaming tables
20  positioned throughout the floor in rooms labeled "Gaming Salons."  The blueprints were later
21  initialed by a CITY official as "Approved."

22      45.     Beginning in 2010, GARDEN CITY representatives reviewed and discussed these
23  blueprints at meetings with CITY representatives concerning its Planned Development Permits.
24  Based on these discussions and the documentation submitted to the CITY, GARDEN CITY
25  reasonably understood the CITY's granting of its Planned Development Permit (PDP10-025) on
26  December 17, 2010 to constitute approval of the use of the eighth floor for gaming.

27      46.     A subsequent CITY-issued amendment to this permit, PDA10-025-01, dated June
28  15, 2012, reiterated the CITY's authorization of gaming on the eighth floor, authorizing, *inter alia*,

1 "Controlled gambling with four (4) card tables on the 8th floor." A second CITY-issued permit,

2 PD12-033, dated November 5, 2012, confirmed that, pursuant to the PDA10-025-01 permit

3 amendment, the eighth floor would be used for gaming. The PD12-033 permit states, **"The**

4 **proposed development and previously approved permits/amendments allow the following**

5 **uses as noted for each floor: . . . . 8th Floor- Gaming,** Drinking and eating establishment."

6 (bolding added for emphasis).

7     47.     Plaintiffs also submitted another application regarding the use of the eighth floor for

8 gaming. On December 15, 2011, Plaintiffs supplemented CASINO M8TRIX's March 30, 2011

9 cardroom permit amendment application to include an amendment to the terms and conditions of

10 CASINO M8TRIX's permit to allow gaming on the eighth floor. Defendants subsequently focused

11 their obstructionist efforts on this supplemental application, and, after **a year of delay,** ultimately

12 denied the application on January 16, 2013.

13     48.     First, Defendants unreasonably and unlawfully delayed completion of a required

14 report on the supplemental cardroom permit amendment. Section 16.30.200(E) of title 16 requires

15 that "[w]ithin a **reasonable time period** after receipt of a completed [permit amendment]

16 application, the administrator shall file a public report . . . ," (emphasis added), including, *inter alia,*

17 (i) a recommendation to the chief of police as to whether the requested amendment should be

18 granted; and (ii) the reasons for the recommendation. In July 2012, over six months after CASINO

19 M8TRIX had submitted its supplemental permit amendment application, TENG still had not issued

20 a report. Rather, in a separate July 20, 2012 Permit Amendment Report, TENG simply stated that

21 "The Division is not in a position to address the proposed use of the 8th floor for gambling purposes

22 at the Casino M8trix due to numerous outstanding and unresolved health, safety and regulatory

23 concerns." The report provides no explanation of these supposed "outstanding and unresolved"

24 concerns. The report then continues, "As such, this item will not be addressed and **will be**

25 **deferred for consideration in a later report** to the Chief of Police." It was not until November

26 15, 2012—**11 months** after Plaintiffs submitted their supplemental permit amendment

27 application—that TENG finally filed a report as required by section 16.30.200(E).

28     49.     Second, Defendants unreasonably and unlawfully delayed issuing a decision on the

1   supplemental permit amendment.  Section 16.30.230(A) requires that "Within a **reasonable**

2   **amount of time** after the close of the hearing, the chief of police shall either approve or disapprove

3   the requested cardroom permit amendment."  San Jose Mun. Code, tit. 16, § 16.30.230(A)

4   (emphasis added).  Defendants held a hearing on November 30, 2012, but did not issue a decision

5   until January 16, 2013.

6       50.      Thus, Defendants, fully aware that CASINO M8TRIX had incurred substantial

7   expense in constructing and furnishing the eighth floor to make it suitable for gaming, unlawfully

8   refused to address Plaintiffs' requested permit amendment for **nearly an entire year** after

9   Plaintiffs filed their supplement to CASINO M8TRIX's cardroom permit amendment application.

10      51.      Defendants' denial of CASINO M8TRIX's supplemental cardroom permit

11  amendment application deprived CASINO M8TRIX of its property interest in its eighth floor, and

12  its reasonable expectation and right to use the floor for gaming.  CASINO M8TRIX has a vested

13  property interest in the granting of its requested amendment to its cardroom permit pursuant to the

14  mandatory, non-discretionary language of Title 16, Section 16.30.230(B), which states:

15          The chief of police **shall permit the amendment** if the chief
            determines and finds that the proposed amendment will not:
16
17          1.      Have an adverse effect on public health, safety, or
            welfare; or
18
            2.      Have an adverse effect on the ability of the
19          administrator and the chief of police to effectively administer
            and enforce the requirements and policies of this title; or
20
            3.      Result in the violation of any city, state, or federal law;
21          or
22          4.      Be inconsistent with the policies, purposes and
            provisions of this title or be contrary to the public interest.
23          (Emphasis added.)

24      52.      The CITY deprived CASINO M8TRIX of its property right by denying CASINO

25  M8TRIX's supplemental cardroom permit amendment based on evidence insufficient to establish

26  findings supporting the factors required under Section 16.30.230(B).  Rather, the CITY hearing

27  officer who ruled on the application simply relied on the insufficient, vague, conclusory, and

28  unsupported allegations set forth by TENG in his November 15, 2012 report.

14
COMPLAINT FOR DAMAGES, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

53.     Further, the CITY deprived CASINO M8TRIX of its reasonable expectation and entitlement to use its eighth floor for gaming, as had been discussed with and approved by the CITY in connection with the CITY's granting of Planned Development Permits authorizing the construction and use of CASINO M8TRIX's new building.

## Defendants Unlawfully Singled Out Casino M8trix for Different Treatment than San Jose's Other Cardroom

54.     The treatment CASINO M8TRIX has received from Defendants stands in marked contrast to the treatment afforded to Sutter's Place, Inc., dba Bay 101 Casino ("Bay 101"), the similarly situated competitor of CASINO M8TRIX and the only other cardroom in San Jose.  Bay 101 is located a short distance from Casino M8trix, at 1801 Bering Drive in San Jose, and is a similar operation, offering a bar and food in addition to gaming at its 49 gaming tables, the same number allotted to CASINO M8TRIX.  Both cardrooms are regulated under the San Jose Municipal Code, in particular title 16.

55.     In contrast to the delays and targeted harassment that CASINO M8TRIX and Plaintiffs have endured from Defendants, Bay 101 has enjoyed timely and obstacle-free processing of its title 16 regulatory needs.  For example, upon information and belief the DIVISION processes Bay 101 temporary key employee licenses more quickly than those of CASINO M8TRIX, and the DIVISION has even granted some of Bay 101's employees full key employee licenses.

56.     Moreover, through another of Defendants' unreasonable and unlawful conditions imposed on Plaintiffs' cardroom permit amendments, Defendants targeted one of Plaintiffs' competitive advantages over Bay 101.  Defendants have required that CASINO M8TRIX "provide full disclosure of the nature and purpose" of its proprietary, web-based business tracking technology and data.  The system, called the Profitable Casino System, was developed by SWALLOW and his software company, Profitable Casino LLC.  The system provides CASINO M8TRIX with real time monitoring of employee scheduling, staffing, and performance information, allowing CASINO M8TRIX to optimize the efficiency of its gaming floor operation and the allocation of its human resources.  The value of Profitable Casino System is well known in the industry.  In 2008, a gaming industry publication credited it as having played a significant role in

1  streamlining CASINO M8TRIX's gaming operations.

2      57.    Not only have Defendants required that Plaintiffs share with them this valuable,
3  proprietary technology, but also they have required, without any explanation, that Plaintiffs provide
4  them with "initial and ongoing training" in the use of the system, "any and all reports generated by
5  the system," and any and all information generated by the system. All such information is to be
6  provided upon demand and also in the form of bi-monthly reports. Defendants have imposed no
7  such burdensome, costly, or intrusive requirement on Bay 101 as a condition of its cardroom
8  permit. Nor have Defendants mandated that Bay 101 reveal to them any of its proprietary means of
9  tracking and managing its business operations or the information derived therefrom.

10      58.    In addition, Defendants required Plaintiffs to forfeit yet another of their competitive
11  advantages to Bay 101. In 2009, Scott Hayden, General Manager of CASINO M8TRIX, patented
12  a new version of the popular card game baccarat, based on a unique set of rules designed to
13  enhance player experience. SWALLOW and MR. LUNARDI currently own the patent through
14  another of their businesses. Plaintiffs sought and obtained approval by the state to begin offering
15  this new game at CASINO M8TRIX. After Plaintiffs applied for the same approval from the
16  DIVISION, TENG declared that CASINO M8TRIX could offer the game at its cardroom only if it
17  agreed to make the game available to its competitor, Bay 101. This was an unreasonable condition
18  since the patent for the game belonged to SWALLOW and MR. LUNARDI, and Bay 101 had
19  absolutely no intellectual property rights to the game. TENG, by this condition, attempted to
20  unilaterally strip SWALLOW and MR. LUNARDI of their right to determine who, if anyone,
21  should be permitted to invade their patent and make use of this new game. No such obligation or
22  cardroom permit condition has ever been placed on Bay 101, and Defendants have not required it
23  to surrender any of its intellectual property rights as a condition of doing business.

24      59.    Defendants have also treated CASINO M8TRIX differently than Bay 101 in regard
25  to the DIVISION's regulation of the cardrooms' surveillance systems. Upon purchasing CASINO
26  M8TRIX in 2007, the OWNERS took it upon themselves to install a new, state-of-the-art security
27  camera system. Despite their continued efforts to secure approval from the DIVISION of their
28  compliance with chapter 7 of the DIVISION's Minimum Internal Control Standards, the portion of

1  the DIVISION's regulations regarding security surveillance, Defendants refused to grant approval

2  of the system or to offer guidelines or criteria to demonstrate to CASINO M8TRIX the steps

3  necessary to secure approval. Defendants then kept CASINO M8TRIX's compliance status in

4  limbo for years.

5        60.      In contrast, the DIVISION has reported to Plaintiffs that Bay 101's security

6  surveillance systems have been fully compliant. Suspiciously, the DIVISION reported Bay 101's

7  compliance *immediately after* the DIVISION had promulgated significant amendments to chapter 7

8  of the Minimum Internal Control Standards in 2010. Bay 101's near simultaneous full compliance

9  with the amended regulations implies either that the DIVISION provided Bay 101 with advanced

10 notice of the amendments or that the DIVISION had simply amended the regulations to match Bay

11 101's existing surveillance system. Regardless of which form of preferential treatment the

12 DIVISION provided to Bay 101, it provided no such assistance to CASINO M8TRIX.

13       61.      The DIVISION has likewise harassed and harmed Plaintiffs by requesting to review

14 an excessive and burdensome amount of video footage from their cardroom surveillance cameras.

15 Over the course of just one month, from April 2010 to May 2010, for example, the DIVISION

16 made ten surveillance video-related requests for dozens of hours of footage, requiring CASINO

17 M8TRIX to spend nearly 100 hours to locate, compile, and re-record the requested video.

18 Producing to Defendants their requested high resolution surveillance video footage typically

19 requires several high capacity 1 terabyte hard drives, each of which costs approximately $100.

20 Defendants have returned none of such hard drives to Plaintiffs, thereby adding hundreds of dollars

21 of cost to each of their video footage requests. Plaintiffs are not aware of the DIVISION imposing

22 any such quantity of costly surveillance requests on Bay 101.

23       62.      More recently, Defendants have unreasonably sought to require CASINO M8TRIX

24 to equip the DIVISION with remote access to CASINO M8TRIX's surveillance system, a

25 requirement that is impossible to meet based on the limited infrastructure of the DIVISION's

26 remote surveillance facility. Both CASINO M8TRIX's information and technology specialist as

27 well as an information and technology specialist for the CITY have determined that the

28 infrastructure of the DIVISION's remote surveillance facility cannot support the high speed

1 Internet capability necessary to host CASINO M8TRIX's high definition surveillance video.

2     63.    Upon information and belief, Defendants have made no such remote surveillance
3 demands upon Bay 101. In fact, logic dictates that if the DIVISION's facility is unable to support
4 the remote video surveillance that Defendants' require of CASINO M8TRIX, neither is it able to
5 accommodate an identical video feed from Bay 101's cardroom surveillance system. Accordingly,
6 either Defendants have not made any such demands on Bay 101, or Defendants have chosen to
7 overlook Bay 101's non-compliance. Either way, Defendants' targeting of CASINO M8TRIX for
8 impossible-to-meet requirements evidences their disparate treatment of CASINO M8TRIX.

9     64.    The DIVISION revealed another instance of its disparate treatment of CASINO
10 M8TRIX in its "Annual Review of the Impact on Cardroom Gambling on Crime in the City of San
11 Jose," submitted to the CITY on January 18, 2013. The report, prepared by the San Jose Police
12 Department and the DIVISION, purports to quantify and analyze gambling-related crime through
13 such flawed metrics as the number of "Calls for Service" for such "crimes" as "Parking
14 Violation[s]," "Expired Registration," and "Traffic Hazard[s]," among others. The report
15 concludes that there has been an increase in calls for service at CASINO M8TRIX during the most
16 recent reporting period.

17     65.    80 of the reported 276 "Calls for Service" at CASINO M8TRIX were for nothing
18 more than "Parking Violation/Expired Registration," up from a report of "0" such calls the previous
19 year. Meanwhile, the DIVISION reported only 2 such calls for Bay 101. During a February 2013
20 City Council meeting in which the Council and Mayor questioned the reliability of the DIVISION's
21 report as a basis for guiding their policy decisions, one Councilmember explained the sharp spike
22 in DIVISION-reported "crime" at CASINO M8TRIX as follows:

23         It's somewhat concerning that . . . all of the sudden . . . in the last two
        years, there's a not-so-secret contentiousness between the police
24         department and Garden City in their efforts to make the move
        [referring to the relocation of CASINO M8TRIX's cardroom]. And
25         so I think from the outside looking in, one can say, look at this and
        say, someone could make a pretty reasonable argument that **they're**
26         **being targeted on these petty infractions to bother their**
        **customers, that if every year there was 50 or 60 . . . , and then**
27         **spiked to 80, that's one thing, but zero, zero seems to indicate**
        **that it wasn't even an issue at all and then all of a sudden the**
28         **Department's having patrol cars going through the Garden City**
        **parking lot, finding a reason to cite their customers.**

1    (Feb. 5, 2013 San Jose City Council Meeting, statement by San Jose City

2  Councilmember Ash Kalra.)

3    66.    Another Councilmember likewise observed:

4        We got 80 parking violations in one casino and two in the other in
         the same year. It shows a little . . . , to me, it shows that they're
5        enforcing it over here, they're not enforcing it over here.

6    (Feb. 5, 2013 San Jose City Council Meeting, statement by San Jose City

7  Councilmember Johnny Khamis.)

8    67.    On information and belief, among the reasons Defendants have not subjected Bay

9  101 to the same type of regulatory harassment as CASINO M8TRIX is that among the individuals

10 employed in Bay 101's leadership is a former DIVISION investigator. Bay 101 hired the former

11 investigator to serve as its Compliance Director within months of his June 2011 retirement from

12 the San Jose Police Department, thereby courting and currying the good favor of the DIVISION by

13 rewarding one of its departing employees with a secure and comfortable post-retirement position.

14 The former investigator, Dennis Faz, had previously been specifically assigned within the

15 DIVISION to regulate Bay 101, and he is intimately familiar with the DIVISION's internal

16 policies and operations.

17    68.    In taking all of the above actions, Defendants have not treated CASINO M8TRIX

18 and Bay 101 equally, even though both entities are similarly situated. Defendants' disparate

19 treatment of CASINO M8TRIX was intentional and without a rational basis. Plaintiffs have no

20 adequate remedy at law for the above-described injuries they have and suffered and continue to

21 suffer, in that monetary damages will not compensate CASINO M8TRIX for its disparate treatment.

22            **Teng's Unlawful Conflicts of Interest and City Ethics Code Violations**

23    69.    Since his installation as Administrator of the DIVISION in 2002 and through the

24 present, TENG has unlawfully regulated CASINO M8TRIX while maintaining a series of conflicts

25 of interest through his lucrative private consulting business, in violation of the CITY's Code of

26 Ethics and state law.

27    70.    Section 16.46.010 of title 16 of the San Jose Municipal Code, titled "Code of

28 ethics," provides as follows:

No city employee directly involved in the regulation of cardrooms or the enforcement of any of the provisions of this title shall knowingly engage in any of the following conduct:

. . . .

(C) Pursue any outside business or employment on an off-duty basis that would conflict with his or her official duties as a city employee respecting the regulation of cardrooms.

(D) Have any interest, financial or otherwise, direct or indirect, or engage in any business or professional activity which is in substantial conflict with the discharge or his or her official duties as a city employee respecting the regulation of cardrooms.

71.     At a December 11, 2012 CITY administrative hearing, TENG testified under oath that he presently works as a private gaming consultant and has been so employed since approximately 1995 or 1996. (Transcript of Dec. 11, 2012 Administrative Hearing, at 34, 43, attached as Exhibit W.) TENG testified that his customers include private gaming enterprises, including casinos and racetracks. (*Id.*, at 44 ("I do some work for tribal casinos, Indian casinos, and commercial casinos, racetracks.").) When asked whether he filed a public form identifying his consulting clients, TENG was evasive. (*Id.*, at 45-47.) For example when asked, "Where is there a document in the City records that we can read that says who your customers are?", TENG responded, "I just told you. It's Richard Teng. He is my customer. I am a subcontractor to many different businesses outside the State of California." (*Id.*, at 189.) TENG also referenced his filing of California Form 700. (*Id.*, at 45-46.)

72.     The California Political Reform Act (Government Code section 81000, *et seq.*) requires certain public officials and employees who make or participate in the making of governmental decisions to disclose any economic interests that could be affected by those decisions. The San Jose City Council has adopted by resolution a list of designated public officials and employees, including the Administrator of the DIVISION, who are required to file an annual Fair Political Practices Commission Form 700 – Statement of Economic Interests.

73.     TENG filed a Form 700 Statement of Economic Interests ("Form 700") for calendar years 2008, 2009, 2010, and 2011, copies of which are attached as Exhibits A-D. TENG reported annual consulting income of between "$10,000 - $100,000" during calendar years 2010 and 2011,

1 (*see* Exhibits C, D), and income in excess of $100,000 during 2008 and 2009, (*see* Exhibits A, B).

2 Accordingly, TENG's total reported private consulting income between 2008 and 2011 was at least

3 $220,000-$400,000.

4      74.    In addition to income, Form 700 requires the reporting of such information as: (i)

5 "Name of Source of Income"; (ii) "Business Activity, if any, of Source"; (iii) "Your Business

6 Position"; and (iv) "Consideration for Which Income was Received." On each of the forms he

7 completed from 2008-2011, TENG listed only a single source of income: "Richard Teng, CPA."

8 (*See* Exhibits A-D.)

9      75.    TENG signed each of his Forms 700 under penalty of perjury. Each Form 700

10 completed and submitted by TENG includes a "Verification" section stating:

11              I have used all reasonable diligence in preparing this statement. I
12              have reviewed this statement and to the best of my knowledge the
             information contained herein and in any attached schedules is true
13              and complete.

             I certify under penalty of perjury under the laws of the State of
14              California that the foregoing is true and correct.

15              (*See* Exhibits A-D.)

16      TENG's name and signature appear beneath the verification section of each of his

17 completed Forms 700. (*Id.*)

18      76.    Upon information and belief, TENG has been employed by and continues to be

19 employed by Spectrum Gaming Group ("Spectrum"), a private gaming consulting business.

20 TENG's public profiles on the business networking website LinkedIn™ list him as holding the

21 positions of "Gaming Administrator, San Jose Police Department," as well as "Senior Consultant,

22 Spectrum Gaming Group." (*See* attached Exhibits E, F.) His status for both positions is listed as,

23 "Currently holds this position." (*Id.*) In addition, various publications, news media articles, and

24 cached pages from Spectrum Gaming Group's website reference TENG's employment by

25 Spectrum during the period spanning at least 2001-2008. (*See* attached Exhibits G-J.) Also,

26 TENG testified that he was actively consulting for Spectrum in 2007 and 2009, and that he has

27 been associated with Spectrum since 1996. (Sept. 23, 2009 "Deposition of Richard Teng, CPA,"

28 *DiMartino v. Swallow, et al.*, No. 108CV121150 (Santa Clara County Superior Court), Vol. I

1  ("Sept. 23, 2009 Teng Depo."), at 12:8 ("I'm an independent consultant to Spectrum."), attached as

2  Exhibit V; Jan. 8, 2007 Administrative Citation Hearing, Case No. PU900864, *City of San Jose v.*

3  *Garden City Casino*, Vol. I, at 96:2-21, attached as Exhibit T.)

4      77.    TENG's involvement with Spectrum has been substantial. TENG has estimated

5  spending an average of 25 hours per week working for Spectrum while also serving as

6  Administrator. (January 9, 2007 Administrative Citation Hearing, Case No. PU900864, *City of San*

7  *Jose v. Garden City Casino*, Vol. II, at 115:5-116:4, attached as Exhibit U.)

8      78.    Spectrum offers such services to casinos as "Casino Opening Assistance." (*See*

9  attached Exhibits K, L.) CASINO M8TRIX has never engaged the services of Spectrum, either for

10 assistance with the opening of its new CASINO M8TRIX cardroom or otherwise.

11     79.    On its website, Spectrum lists among its customers the Tohono O'odham Nation, for

12 whom it "performed a feasibility study on a proposed Glendale, CA, casino hotel . . . ," as well as

13 the City of San Jose. (*See* attached Exhibits M, N.) Spectrum's website also references Spectrum's

14 work in "court rooms in San Jose, CA." (*See* attached Exhibit O.)

15     80.    CITY records confirm that the CITY has entered into consulting contracts with

16 Spectrum, including:

17         i.   A $135,000 "consultant agreement with Spectrum Gaming Group for the

18             review of the City's cardroom ordinance and regulation of cardrooms for the

19             period February 3, 1998 to December 31, 1998," attached as Exhibit P;

20        ii.   An amendment to the City's consultant agreement with Spectrum "to extend

21             the term of the agreement through September 30, 2002, and to increase the

22             amount of total compensation by $116,692.50 to a total amount not to

23             exceed $210,000," attached as Exhibit Q. The amendment provides that

24             "[t]his additional cost will be reimbursed to the City by the cardrooms."

25       iii.   A January 17, 2002 amendment to the City's consultant agreement, ". . . for

26             additional compensation up to a total amount not to exceed $400,000,"

27             attached as Exhibit R; and

28       iv.   A June 15, 2006 "Fourth Amendment to Agreement with Spectrum Gaming

1  Group, LLC ("Spectrum") for expert services related to cardroom and
2  gaming litigation, extending the term through June 30, 2007, and increasing
3  compensation by $30,000 for a total amount not to exceed $130,000,"
4  attached as Exhibit S.

5  The CITY was a party to one or more of these contracts while TENG was employed
6  as Administrator of its Division of Gaming Control, a position he has held since 2002.

7  81.  Spectrum's customers include California-based gaming businesses, which may
8  include competitors of CASINO M8TRIX. TENG's employment by Spectrum necessarily imputes
9  Spectrum's financial interests and business activity to TENG. Indeed, TENG has testified that he
10  works for ". . . tribal casinos, Indian casinos, and commercial casinos . . . ." (Dec. 11, 2012
11  Hearing Transcript, at 44, attached as Exhibit W.) Further, Spectrum has a stake in California
12  gaming interests through contracts with gaming regulators, such as its contracts with CITY.

13  82.  TENG has also suggested that he works as an independent contractor or gaming
14  consultant for entities in addition to Spectrum, the identities of which he has not disclosed:

15  Q. Have you consulted -- have you acted as an independent
    contractor or gaming consultant for any entity other than Spectrum?
16
17  A. Yes, I have.

    Q. What other entities?
18
19  A. Since when, sir?

20  Q. Setting aside the employment you've described for us, from the
    beginning of time to today.
21
    A. Some of these cases I did do on the undercover basis, so I'm not
22  so sure if I want to disclose the name of the clients.

23  (Sept. 23, 2009 Teng Depo., at 95:6-16, attached as Exhibit V.)

24  In another reference to his additional private consulting clients, TENG stated: "I
25  maintain an office in my house in Las Vegas, and I use the name Richard Teng, CPA as that
26  business. So in that business I've done work for several casinos in Vegas." (*Id.*, at 96:8-11.)

27  83.  TENG's 2008-2011 Forms 700 do not identify Spectrum, any of Spectrum's
28  customers, or any other of TENG's private clients as a "Source of Income." (*See* Exhibits A-D.)

**COMPLAINT FOR DAMAGES, DECLARATORY RELIEF AND INJUNCTIVE RELIEF**

1   Nor do the forms identify TENG's position with Spectrum as a "Business Position" of his. (*Id.*)

2        84.     The above-described outside business activity, outside employment, direct and

3   indirect financial interests, and related professional activities of TENG substantially conflict with

4   TENG's official duties as a city employee respecting the regulation of cardrooms, including

5   CASINO M8TRIX.

6        85.     By having engaged in such conflicts of interest from the inception of his regulation

7   of San Jose's cardrooms in 2002 through the present, TENG has violated and continues to violate

8   his mandatory, ministerial duties to Plaintiffs under sections 16.46.010(C) and 16.46.010(D) of title

9   16.  Furthermore, TENG violated state and local law, including the California Political Reform Act,

10   by having unlawfully failed to disclose this information in his 2008, 2009, 2010, and 2011 Forms

11   700.

12   **Defendants' Harm to Plaintiffs**

13        86.     Defendants' conduct has caused and continues to cause substantial economic harm

14   to Plaintiffs.  Prior to beginning operations at its new CASINO M8TRIX facility, GARDEN CITY

15   employed approximately 500 people and served over 40,000 customers annually.  The new

16   CASINO M8TRIX is expected to draw double the number of customers and will employ 800

17   people.  Once CASINO M8TRIX's eighth floor and other facilities are fully operational, over

18   100,000 annual customers are expected.

19        87.     By delaying each stage of the landowner licensing and cardroom permit amendment

20   process, and then by further delaying the opening of CASINO M8TRIX from April 2012 until

21   August 7, 2012, Defendants caused Plaintiffs to lose revenue that they would have generated by

22   operating CASINO M8TRIX during that time.  Plaintiffs were further damaged by having to pay

23   for the overhead and operational costs of both the Garden City and Casino M8trix facilities during

24   this time.

25        88.     Defendants continue to cause substantial economic harm to Plaintiffs and to deprive

26   CASINO M8TRIX of its vested property interest in its eighth floor by restricting gaming to the

27   ground floor only of CASINO M8TRIX and by prohibiting gaming or any other revenue-

28   generating operation on the eighth floor.  As a result, Plaintiffs have lost both gaming revenue and

1  also revenue stemming from the loss of customer traffic to the eighth floor generally.

2       89.     Defendants caused Plaintiffs further damage by the unpredictable nature of and
3  frequent delays in Defendants' licensing process. Plaintiffs relied on the scheduled and carefully
4  planned opening of CASINO M8TRIX in April 2012 by (i) planning to sublease CASINO
5  M8TRIX's interest in its previous Garden City cardroom that month; (ii) planning on that month as
6  the timeframe within which 720 new and existing CASINO M8TRIX employees would begin work
7  at CASINO M8TRIX; and (iii) conducting a radio, print, and television advertising campaign to
8  notify the public that the grand opening of CASINO M8TRIX would take place that month. When
9  Defendants delayed the opening beyond April 2012, Plaintiffs were unable to recoup these costs of
10  preparation.

11       90.     Further, since April 2012, Plaintiffs were made to guess at what date they might be
12  able to open and begin operating CASINO M8TRIX. Thus, Plaintiffs were forced to bear the costs
13  of continuously coordinating and rescheduling all the logistics necessary for the opening of their
14  new facility, including: (i) leasing CASINO M8TRIX's previous facility; (ii) funding and planning
15  their opening day advertising campaign; and (iii) hiring hundreds of employees and independent
16  contractors to operate the new casino.

17       91.     In addition, each time that Defendants further delayed the date on which Plaintiffs
18  were to be allowed to open CASINO M8TRIX, Plaintiffs lost business goodwill from having to
19  cancel contracts and reschedule services with a host of outside vendors. The prolonged delay in
20  opening also caused a loss of morale among CASINO M8TRIX's personnel, many of whom had
21  been waiting to start work for months, some of whom gave up or found alternative employment in
22  the meantime (requiring Plaintiffs to rehire for their anticipated positions), and others who are
23  continuing to wait to start working in positions related to operations on the eighth floor. Likewise,
24  Plaintiffs suffered a loss of business goodwill from potential customers who expected CASINO
25  M8TRIX to open in April, including an estimated 80 people per day who arrived at its doors
26  beginning that month.

27  /////
28  /////

**FIRST CAUSE OF ACTION**
(Deprivation of Plaintiffs' Civil Rights to Procedural and Substantive Due Process in
Violation of 42 U.S.C. § 1983)
(Against all Defendants)

92.     Plaintiffs incorporate paragraphs 1 through 88, inclusive, by reference as though set forth in full.

93.     TENG, by his actions, and the CITY and the DIVISION, by their policies, customs, and practices, directly and proximately caused CASINO M8TRIX to be deprived of property without due process of law, in violation of its Fourteenth Amendment Right to Due Process, as guaranteed by the United States Constitution and 42 U.S.C. § 1983.

94.     In doing the acts complained of herein, Defendants were acting under color of local law.

95.     CASINO M8TRIX has a vested property interest in the granting of its requested amendment to its cardroom permit pursuant to the mandatory, non-discretionary language of Title 16, Section 16.30.230(B) of the San Jose Municipal Code, which states:

> The chief of police **shall permit the amendment** if the chief determines and finds that the proposed amendment will not:
>
> > 1.     Have an adverse effect on public health, safety, or welfare; or
> >
> > 2.     Have an adverse effect on the ability of the administrator and the chief of police to effectively administer and enforce the requirements and policies of this title; or
> >
> > 3.     Result in the violation of any city, state, or federal law; or
> >
> > 4.     Be inconsistent with the policies, purposes and provisions of this title or be contrary to the public interest.

(Emphasis added.)

96.     CASINO M8TRIX's property interest in the use of its eighth floor for gaming is further supported by (i) the CITY's granting of Planned Development Permits PDP10-025, PDA10-025-01, and PD12-033 on December 17, 2010,  June 15, 2012, and November 5, 2012, respectively; (ii) the CITY's receipt, review, and confirmation of documentation regarding eighth floor gaming, including detailed blueprints illustrating such use; and (iii) the CITY and CASINO

1 | M8TRIX's shared and reasonable understanding before, on, and after December 17, 2010 of the
2 | intended use of the eighth floor for such purpose.

3 |      97.     Defendants, by their abusive and unlawful review, investigation, and unfounded
4 | denial of CASINO M8TRIX's application to amend its cardroom permit to allow gaming on its
5 | eighth floor, and by other improper, invalid, arbitrary, and capricious acts, have intentionally
6 | deprived CASINO M8TRIX of its property interest in the use of its eighth floor for gaming,
7 | including its property interest in the timely granting of its requested supplemental cardroom permit
8 | amendment to allow gaming on the eighth floor.

9 |      98.     CASINO M8TRIX has no plain, speedy, or adequate remedy at law, and for that
10 | reason it seeks declaratory and injunctive relief.

11 |      99.     An actual controversy exists between CASINO M8TRIX and Defendants as to
12 | whether Defendants' denial of CASINO M8TRIX's application to amend its cardroom permit to
13 | allow gaming on the eighth floor of its cardroom, as described herein, deprived CASINO M8TRIX
14 | of property without due process of law in violation the Due Process Clause of the Fourteenth
15 | Amendment of the United States Constitution and 42 U.S.C. § 1983.

16 |      100.     The parties require a judicial declaration of rights in order to properly address
17 | CASINO M8TRIX's complaints about Defendants' practices.  Specifically, the parties require a
18 | declaration from the Court regarding whether Defendants' denial of CASINO M8TRIX's
19 | application to amend its cardroom permit amendment to allow gaming on the eighth floor of its
20 | cardroom, as alleged herein, deprived CASINO M8TRIX of property without due process of law in
21 | violation of the Due Process Clause of the Fourteenth Amendment of the United States
22 | Constitution and 42 U.S.C. § 1983.

23 |      101.     Unless restrained or enjoined by this court, Defendants will continue to subject
24 | CASINO M8TRIX to their unlawful conduct described herein, in violation of the Due Process
25 | Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983, and
26 | CASINO M8TRIX will suffer great and irreparable injury.

27 |      WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as
28 | hereinafter set forth.

COMPLAINT FOR DAMAGES, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

## SECOND CAUSE OF ACTION
(Deprivation of Plaintiffs' Civil Rights to Equal Protection in Violation of 42 U.S.C. § 1983)
(Against all Defendants)

102.     Plaintiffs incorporate paragraphs 1 through 98, inclusive, by reference as though set forth in full.

103.     TENG, by his actions, and the CITY and the DIVISION, by their policies, customs, and practices, directly and proximately caused CASINO M8TRIX to be deprived of its Fourteenth Amendment Right to Equal Protection, as guaranteed by the United States Constitution and 42 U.S.C. § 1983.

104.     In doing the acts complained of herein, Defendants were acting under color of local law.

105.     Defendants knowingly and maliciously singled out CASINO M8TRIX for selective treatment, including by violating and selectively enforcing title 16 of the San Jose Municipal Code and DIVISION regulations, to punish, cause delay to, and harass CASINO M8TRIX and its business, and by selectively conducting harassing investigations of CASINO M8TRIX, its employees, and its affiliates, under the auspices of local ordinances and regulations.

106.     Defendants directed no such selective treatment to San Jose's only other cardroom, Bay 101, which is similarly situated to CASINO M8TRIX and subject to the same regulation by the DIVISION under Title 16 of the San Jose Municipal Code.

107.     Defendants had no rational basis for their actions.

108.     CASINO M8TRIX has no plain, speedy, or adequate remedy at law, and for that reason it seeks declaratory and injunctive relief.

109.     An actual controversy exists between CASINO M8TRIX and Defendants as to whether Defendants' treatment of CASINO M8TRIX as described herein deprived CASINO M8TRIX of its rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

110.     The parties require a judicial declaration of rights in order to properly address CASINO M8TRIX's complaints about Defendants' practices.  Specifically, the parties require a declaration from the Court regarding whether Defendants' treatment of CASINO M8TRIX as

1  described herein deprived CASINO M8TRIX of its rights under the Equal Protection Clause of the

2  Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

3       111.    Unless restrained or enjoined by this court, Defendants will continue to subject

4  CASINO M8TRIX to their unlawful conduct described herein, in violation of the Equal Protection

5  Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983, and

6  CASINO M8TRIX will suffer great and irreparable injury.

7       WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

8  hereinafter set forth.

9  ## PRAYER FOR RELIEF

10       WHEREFORE, Plaintiffs pray that a judgment be entered against Defendants as follows:

11      1.    For general damages in an amount according to proof;

12      2.    For compensatory damages in an amount according to proof;

13      3.    For special damages for lost earnings in an amount according to proof;

14      4.    For exemplary and punitive damages against Administrator Teng for reasons not

15  limited to the following:

16          a.    TENG's willful, unlawful, malicious, and wanton disregard of, or intentional malice

17             toward the rights of Plaintiffs;

18          b.    TENG should be deterred from engaging in such extreme and egregious conduct in

19             the future;

20      5.    For prejudgment interest;

21      6.    For costs of suit incurred herein;

22      7.    For reasonable attorney's fees to the fullest extent permissible by law, including

23  those recoverable under 42 U.S.C. § 1988;

24      8.    For a judicial declaration of the parties' rights.  An actual, present controversy exists

25  between Plaintiffs and Defendants, because Plaintiffs contend and Defendants deny that

26  Defendants have deprived Plaintiffs of certain of their civil rights.  Accordingly, Plaintiffs pray for

27  a declaration that Defendants deprived CASINO M8TRIX of one or more federally protected rights

28  in violation of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983;

9.      For a preliminary and permanent injunction ordering Defendants to cease and desist their practices of disparate and unequal treatment of Plaintiffs, including but not limited to an order requiring Defendants to (i) cease and desist from requiring Plaintiffs, as a condition of amending CASINO M8TRIX's cardroom permit or otherwise, to disclose to Defendants the technology, data, or related information underlying the Profitable Casino System or to engage in any training of Defendants or their personnel regarding the same; (ii) cease and desist from conditioning their permission for Plaintiffs to offer their patented version of baccarat at CASINO M8TRIX on the sharing of said intellectual property with Bay 101; (iii) cease and desist from enforcing remote surveillance system requirements on Plaintiffs that are impossible to meet due to limitations to the DIVISION's remote surveillance facility and which requirements Defendants do not likewise require of CASINO M8TRIX's similarly situated competitor, Bay 101;

10.     For a preliminary and permanent injunction ordering Defendants to grant CASINO M8TRIX's requested cardroom permit amendment to allow gaming on the eighth floor of CASINO M8TRIX;

11.     For a preliminary and permanent injunction ordering that all recommendations and decisions that TENG made while he had a disabling conflict of interest be annulled as unlawful and violative of Plaintiffs' due process;

12.     For a preliminary and permanent injunction restraining and enjoining the CITY from employing TENG as Administrator of the DIVISION concurrent with TENG's disabling conflicts of interest; and

13.     For such other and further relief as this Court may deem just and proper.

DATED:  February 8, 2013.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _____

ALLEN RUBY
Attorney for Plaintiff

COMPLAINT FOR DAMAGES, DECLARATORY RELIEF AND INJUNCTIVE RELIEF

1

## DEMAND FOR JURY TRIAL

2

Plaintiffs demand trial of their claims by jury to the extent authorized by law.

3
DATED:  February 8, 2013.

4

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

5

6

By: _____

7

ALLEN RUBY
Attorney for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31
COMPLAINT FOR DAMAGES, DECLARATORY RELIEF AND INJUNCTIVE RELIEF